1  Jacob A. Walker (SBN 271217)
2  **BLOCK & LEVITON LLP**
   400 Concar Drive
3  San Mateo CA 94402
   (650) 781-0025
4  jake@blockleviton.com

5  *Counsel for Lead Plaintiff Erwin Ortiz*
   *And Lead Counsel for the Putative Class*

6  [Additional Counsel Appear on Signature Page]

7           **UNITED STATES DISTRICT COURT**
8         **SOUTHERN DISTRICT OF CALIFORNIA**

9  SHAJI NELSON, individually and on behalf
   of all others similarly situated,
10
                                              Case No. 3:25-cv-00499-AGS-AHG
11         Plaintiff,

   v.                                         **CLASS ACTION COMPLAINT FOR**
12                                            **VIOLATION OF THE FEDERAL**
   MARAVAI LIFESCIENCES HOLDINGS,             **SECURITIES LAWS**
13  INC., WILLIAM E. MARTIN, III, AND
   KEVIN HERDE,                               **DEMAND FOR JURY TRIAL**
14
           Defendants.
15

16

17

...

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

NATURE AND SUMMARY OF THE ACTION ..................................................1

JURISDICTION AND VENUE ...........................................................................7

PARTIES ...........................................................................................................8

SUBSTANTIVE ALLEGATIONS .....................................................................9

    I.       Maravai's Core Business Operations. ....................................9

    II.     Maravai's Successful Rise During the COVID-19 Pandemic. ...........10

    III.    Maravai Struggles as COVID-19 Vaccine Demand Evaporates. .........11

    IV.    Maravai Begins to Regain Investor Confidence and Position Itself for a Favorable Acquisition by Hitting its Revenue Targets in Consecutive Quarters. ...........12

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...........................................16

DISCLOSURES AT THE END OF THE CLASS PERIOD.............................22

LOSS CAUSATION/ECONOMIC LOSS .......................................................26

ADDITIONAL SCIENTER ALLEGATIONS..................................................27

    I.       Maravai's Potential as a Strategic Acquisition Target Created a Motive to Pull Forward Revenue to Hit Guidance. ...........28

    II.     The Individual Defendants Were Responsible for and on Notice of Deficiencies in Maravai's Internal Controls ...........31

    III.    The Individual Defendants Were Uniquely Personally Motivated to Push Maravai to Appear to Have Regained Financial Health...........34

    IV.    The Restatement of the Company's Financial Statements Came Quickly After a Change in Company Leadership...........35

    V.     The Individual Defendants Were Quickly Replaced by the Company Following the Disclosures of Financial Irregularities ...........35

APPLICABILITY OF PRESUMPTION OF RELIANCE:...............................36

NO SAFE HARBOR ........................................................................................37

CLASS ACTION ALLEGATIONS .................................................................37

i

COUNT I For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)............................................................38

COUNT II For Violation of §20(a) of the Exchange Act (Against the Individual Defendants) ...39

PRAYER FOR RELIEF ............................................................40

DEMAND FOR JURY TRIAL ............................................................40

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Erwin Ortiz ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to matters concerning Lead Plaintiff, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendants Maravai Lifesciences Holdings, Inc. ("Maravai" or the "Company"), William E. Martin, III ("Martin"), and Kevin Herde ("Herde," and, together with Martin, "Individual Defendants"), with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a class action on behalf of all persons and entities that purchased or otherwise acquired Maravai securities between August 7, 2024 and February 24, 2025, inclusive (the "Class Period"). Lead Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Maravai is a life sciences company, formed in 2014, which provides products to enable the development of drug therapies, diagnostics, novel vaccines, and support research on human diseases worldwide. Maravai's most significant business segment produces complex nucleic acids for research and diagnostic purposes.

3.    Maravai's nucleic acid production positioned the Company well to capitalize on the research and development of COVID-19 vaccines, which used a new technology based on mRNA. Maravai's proprietary "CleanCap" mRNA technology became a key component of several mRNA vaccines developed for COVID-19, including the vaccine developed by Pfizer and BioNTech which received Emergency Use Authorization ("EUA") in December 2020, one of the first vaccines approved for use in the United States and which sold 3 billion doses in its first year.

4.      Maravai generated record revenues once Pfizer's COVID-19 vaccinations went into full-scale production. The Company reported $799 million in revenue in 2021, increasing to $883 million in 2022.

5.      In February 2022, when Maravai was still soaring high on its COVID-19 revenues, the Company received an $11 billion buy-out offer from German biopharmaceutical company Sartorius AG, valuing the company at $42 per share (an approximately 20% premium over the prior day's closing price of $33.50). Maravai reportedly rejected the offer as being too low.

6.      Maravai and its investors hoped that the pandemic would be just the beginning of a new opportunity for commercial mRNA vaccines. But as the pandemic wound down and demand for COVID-19 vaccines subsided, Maravai's prospects quickly faded without the hoped-for revolution in mRNA technologies materializing beyond the research phase. The Company reported just $288.9 million in revenue for 2023, a 67% decline year-over-year, and well short of the $420 million to $460.0 million guidance it had provided at the start of the year, as new mRNA vaccines failed to reach commercialization following the pandemic.

7.      However, Maravai's value had a built-in backstop. As the Sartorius offer demonstrated, Maravai's proprietary technologies made it a uniquely attractive acquisition target. For years, the Company had drawn strong interest from suitors. Once the pandemic-era revenues dried up, however, the Company was no longer in the attractive position it had been in when it rejected Sartorius' offer.

8.      Without the benefit of COVID-19 vaccine related revenues, Maravai began a prolonged streak of missing its financial targets after the second fiscal quarter of 2022. Maravai's skid diminished the Company's value both to investors and as a potential take-over target, bringing the stock price down from its August 2021 peak of over $60 per share down to just $9.09 per share the day before the start of the Class Period.

9.      Accordingly, it became crucial for Maravai to "get back to consistently hitting financial targets," as RBC Capital Markets analysts wrote in a February 22, 2024 report, in order to regain investor confidence.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

10.    Stabilizing its financial health would also help Maravai demonstrate value to prospective acquirers who could throw the Company a lifeline. Reports continued to emerge that the Company had drawn interest from various entities, but the offers were opportunistically timed during Maravai's prolonged slump, suggesting that the suitors were hoping to buy low on a distressed asset. Private equity firm Thomas H. Lee Partners, for example, made a bid in May 2023 a week after Maravai was forced to slash its 2023 revenue guidance by $20 million and its stock had shrunk to a quarter of its previous high.

11.    If Maravai wanted to attract more favorable offers, it would have to show that the Company could succeed and its core business could grow without the excess COVID-19 related demand for "CleanCap." As one analyst examining Maravai's buy-out potential wrote in July 2023, the Company's "commitment to diversify its revenue streams beyond COVID-19 related products" appeared to "position[] the company for future growth."

12.    On February 22, 2024, "[f]or the first time in recent memory," as one analyst wrote, Maravai announced it had finally "beat" its revenue and EBITDA guidance for a fiscal quarter, the fourth quarter of 2023. Maravai reported quarterly revenue of $74.1 million, exceeding the Company's prior guidance of $60 million to $70 million for the quarter. Maravai also provided guidance for Fiscal Year 2024 ("FY 2024") revenue in the range of $265.0 million to $285.0 million.

13.    Analysts believed the announcement was a building block for Maravai's possible "return," but stressed that the Company would have to "get back to consistently hitting financial targets" to turn the one-off into a real sign of recovery. Looking ahead to Maravai's FY 2024 guidance, analysts stressed that it was only "if the company" could continue to "execute[]" on its guidance that "investors will be attracted back..."

14.    Maravai managed to hit its target again in the first quarter of 2024 ("1Q 2024"). On May 8, 2024, Maravai announced 1Q 2024 quarterly revenue of $64.2 million, which beat the quarterly guidance of the $58.3 million to $62.7 million it had projected at the beginning of the year.

15.    During a conference call held that day, Maravai's CFO, Defendant Herde, said Maravai expected much higher revenue for the second quarter: "about $73 million or so."

16.     After two straight quarters of revenue beats, all eyes turned to the next fiscal quarter as a make-or-break moment. Analysts stressed the importance of the upcoming second quarter of 2024 ("2Q 2024"). "[W]e think the profitability ramp in the second quarter (as an indicator of future leverage) is important to build confidence in the post-COVID Maravai story," William Blair wrote in a May 9, 2024 note. RBC Capital Markets headlined its own May 8, 2024 report: "One More [Quarter] and It's a Streak."

17.     RBC also noted in a March 7, 2024 report that it would be important to show Maravai could hit its revenue projections in order to make it a favorable acquisition target. Maravai could draw interest from "the big players" in the bioproduction industry, RBC wrote, "especially if they hit targets" for revenue and EBITDA margin.

18.     The Class Period opens when, on August 7, 2024, Maravai announced it had achieved the much anticipated revenue streak. The Company reported 2Q 2024 revenue of $73.4 million, surpassing its guidance by the slimmest of margins. Moreover, Maravai's 2Q 2024 revenue put the company at exactly 50.03% of the midpoint of its FY 2024 guidance range, suggesting the company was well positioned to meet its annual guidance. Indeed, Defendant Herde stated on the Company's earnings call held that day that, "[b]ased on Q2 revenues being in line with our expectations," Maravai "remain[ed] comfortable with the existing 2024 total revenue range of $265 million to $285 million."

19.     Financial analysts lauded Maravai's apparent revenue streak, writing that Maravai was "getting its mojo back" after "three straight quarters of top-line beats," and therefore predicting a "return to healthy growth in '25 and beyond." RBC wrote that "[w]ith solid Q2 results, MRVI's Triple Lindy -- 3 straight revenue beats and a return to positive growth -- should resonate well with investors." Deutsche Bank remarked the "Bigger picture" was that Maravai had "delivered top-line beats for 3 consecutive quarters," which indicated that the Company "remains on track for 2024 revenue targets…"

20.     By meeting its 2Q 2024 revenue target and establishing a streak, Maravai was able to portray itself as though it was regaining financial stability and had finally found a bedrock for growth in the post-COVID-19 era. This made Maravai appear to be an attractive target with stable financials

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

and long-term prospects, and therefore put the Company in a better position for a more favorable life-line in the form of an acquisition.

21.    Indeed, just over a week later, on August 16, 2024, *Reuters* issued an unconfirmed report that Repligen Corp, a large producer of drug manufacturing tools, had made an offer to acquire Maravai. Neither Repligen nor Maravai ever confirmed that any offer had been made, or at any particular price. On this news, however, RBC speculated that a Repligen offer could end up in the range of $15 to $20 per share, a 55% to 107% premium on Maravai's closing price on August 16, 2024 of $9.68 per share.

22.    However, Maravai's revenue streak was a mirage. On the morning of February 25, 2025, the day Maravai was scheduled to report its FY 2024 earnings, Maravai announced that it was postponing its earnings release and would delay filing its annual report on Form 10-K for the fiscal year ended December 31, 2024. The Company disclosed that it had identified an error in revenue recognition that "resulted in approximately $3.9 million in revenue being recorded in the final week of the second quarter of 2024 upon shipment when it should have been recorded in the first week of the third quarter of 2024 upon receipt by the customer." The Company further announced it had identified "a material weakness in its internal controls over revenue recognition." In addition, Maravai disclosed that it needed "additional time to complete [an] assessment of a potential non-cash impairment charge related to goodwill" associated with Alphazyme LLC ("Alphazyme"), a company Maravai had acquired in 2023.

23.    The $3.9 million Maravai improperly recognized in 2Q 2024 allowed the company to barely meet its $73 million revenue guidance for the quarter. Without pulling revenue forward, the Company would have recorded only $69 million for the quarter, short of both Maravai's and analysts' expectations. The miss would have ended Maravai's streak and demonstrated that the Company was not on pace to meet its FY 2024 guidance, diminishing Maravai's attractiveness as an acquisition target.

24.    Maravai's share price fell $0.87, or 21.70%, to close at $3.14 per share on February 25, 2024, on unusually heavy trading volume.

25.     On March 18, 2025, after market close, Maravai released its late and restated financials on SEC Form 10-K ("March 18, 2025 10-K"). The March 18, 2025 10-K showed year-end revenue for FY 2024 of just $259 million, well short of even the low-end of Maravai's revenue guidance of $265 million to $285 million, and restated Maravai's 2Q 2024 revenue downwards by $3.977 million. The company explained that the revenue was improperly recognized upon its shipment to the customer in the last week of 2Q 2024 rather than upon delivery, which occurred in the following quarter. This "error," at the time, allowed Maravai to exceed its 2Q 2024 revenue projections and achieve its "streak" of meeting or exceeding guidance.

26.     The March 18, 2025 10-K further explained that despite undertaking testing for goodwill impairment in the third quarter of 2024, the Company had not recorded, as it should have, an $11.9 million goodwill impairment to Alphazyme.

27.     The March 18, 2025 10-K contained an admission from the Company that its management had failed to "design and operate effective controls over the Company's revenue process" as well as its goodwill impairment processes. The Company also included a report from its auditor, Ernst & Young LLP ("E&Y") explaining that E&Y had "expressed an adverse opinion" on "the Company's internal control over financial reporting as of December 31, 2024."

28.     Maravai's stock price fell from a closing price on March 18, 2025 of $2.58 to close at $2.43 the following day, March 19, 2025, a decline of 15 cents or 5.8%.

29.     Then, on March 20, 2025, after market close, Maravai held an earnings call to discuss its year-end results. During the call, Defendant Herde explained that according to "the shipping terms for th[e] order" that was pulled forward into 2Q 2024, "we should have recognized revenue upon receipt of the shipment by the customer or about a week later than we did." He further acknowledged: "we did not maintain effective controls over our revenue process and our goodwill impairment assessment process and thus have identified these as material weaknesses in internal control over financial reporting."

30.     On this news, Maravai's stock price fell 14 cents, from a closing price on March 20, 2025 or $2.40 to close at $2.26 the following day, March 21, 2025, a 5.8% decline.

31.     Investors' losses at the conclusion of the Class Period were proximately caused by the revelations that Maravai's 2Q 2024 revenue had been overstated, plus the disclosure that the Company's internal controls were insufficient notwithstanding Defendants' prior representations otherwise.  During the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts, including: (1) Maravai lacked adequate internal controls over financial reporting related to revenue recognition; and (2) as a result, the Company inaccurately recognized revenue on certain transactions during fiscal 2024.

32.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

33.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

34.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

35.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

36.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

37.     As set forth in the certification previously filed with the Court (ECF No. 14-4), Lead Plaintiff Edwin Ortiz purchased shares of Maravai common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

38.     Defendant Maravai is incorporated under the laws of Delaware with its principal executive offices located in San Diego, California. Maravai's common stock trades on the NASDAQ exchange under the symbol "MRVI."

39.     Defendant William E. Martin, III ("Martin") was Maravai's Chief Executive Officer ("CEO") at all relevant times. Additionally, Martin was a member of Maravai's Board of Directors from July 31, 2024 until June 8, 2025. Martin signed his Sarbanes-Oxley Certification attesting that the second and third quarter Form 10-Qs did not "contain any untrue statement of a material fact" or "omit to reveal a material fact" and that Maravai's internal controls were properly designed and were effective.

40.     Defendant Kevin Herde ("Herde") was Maravai's Chief Financial Officer ("CFO") at all relevant times. Herde signed each of the materially false and misleading SEC Form 10-Qs for Maravai's second and third quarters of 2024. Herde also signed his Sarbanes-Oxley Certification attesting that the second and third quarter Form 10-Qs did not "contain any untrue statement of a material fact" or "omit to reveal a material fact" and that Maravai's internal controls were properly designed and were effective.

41.     Defendants Martin and Herde, collectively, are referred to throughout this Amended Complaint as the "Individual Defendants." The Individual Defendants together with Maravai are referred to as "Defendants" throughout this Amended Complaint.

42.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants

authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.  Because of their positions with the Company and access to material non-public information available to them but not to the public, including, without limitation, the purchase orders and sale terms for the Company's goods, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

<strong>SUBSTANTIVE ALLEGATIONS</strong>

**I.      *Maravai's Core Business Operations.***

43.     Maravai is a life sciences company which provides products to enable the development of drug therapies, diagnostics, novel vaccines, and support research on human diseases worldwide.

44.     Maravai's business operates in two main segments. Its first, and most significant, core business segment is nucleic acid production ("NAP"). NAP manufactures complex nucleic acids for vaccines, therapeutics, and diagnostics, as well as custom enzymes for research and diagnostic purposes. Maravai's second core business segment produces biologics safety testing ("BST") technologies used to test drug manufacturing processes. For instance, Maravai creates, among other things, products that help detect impurities and contaminates in biopharmaceuticals.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

| | Primary Brand | Product | mRNA Vaccines and Therapeutics | Cell and Gene Therapy | Biologics and Biosimilars | Molecular Diagnostics |
|---|---|---|---|---|---|---|
| **Nucleic Acid Production** | TriLink | RNA Capping | CleanCap® | CleanCap® | | |
| | | mRNA Raw Materials | Nucleoside Triphosphates (NTPs) | NTPs | | |
| | | mRNA | mRNA | mRNA | | |
| | | Plasmid DNA | Plasmids | Plasmids | | |
| | | Custom Oligonucleotides | | Guide RNA and Donor DNA Oligonucleotides | | Custom Oligonucleotides |
| | | Custom Nucleic Acid Synthesis | NTPs | Monomers, Supports, NTPs | | Monomers, Supports, NTPs |
| | Glen Research | Oligonucleotide Synthesis Inputs | | Monomers, Supports, NTPs | | Monomers, Supports, NTPs |
| | Alphazyme | Specialty Enzymes | Enzymes | Enzymes | | Enzymes |
| **Biologics Safety Testing** | Cygnus | Host Cell Protein Detection Kits | | Kits, Reagents | Kits, Reagents | |
| | | Viral Contamination Detection | | MockV® Kits | MockV® Kits | |

⊘ Maravai Products Offered

(*Source: Maravai Form 10-K for the fiscal year ended December 31, 2023, filed with the SEC on Feb. 29, 2024*)

45.    The Company reported $259.2 million in revenue for Fiscal Year 2024 ("FY 2024"), which ended on December 31, 2024. A portion of Maravai's revenue comes from sales of its products to distributors who resell the products to end users.

## II.    *Maravai's Successful Rise During the COVID-19 Pandemic.*

46.    Maravai rose to prominence during the COVID-19 pandemic thanks to its role in developing nucleic acid products which were used in the development of mRNA vaccines for COVID-19. In 2016, Maravai acquired TriLink BioTechnologies ("TriLink"), which specializes in mRNA products. One such product, "CleanCap," became a key component of several mRNA vaccines for COVID-19, including the vaccine developed by Pfizer and BioNTech which received Emergency Use Authorization ("EUA") from the United States Food and Drug Administration in December 2020.

47.    Naturally occurring mRNA strands are "capped" with molecular structures which prevent the mRNA strands from degrading and support accurate translation of the genetic information contained in the strand. Creating these caps in a laboratory setting usually involved a multi-step process with several chemical reactions and purification steps. Maravai's proprietary

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

"CleanCap" synthetic cap analog reduces the number of steps—and therefore the amount of time and complexity—needed to cap mRNA strands. CleanCap could therefore be used to stabilize and streamline mRNA production and manufacturing in the development of mRNA vaccines.

48.     CleanCap technology was a key component in the development and production of the Pfizer COVID-19 vaccine developed in partnership with BioNTech. Approximately 3 billion doses of Pfizer's vaccine were manufactured within a year of the EUA. CleanCap was also used in a vaccine developed by BioNTech in partnership with Fosun Pharma, and two vaccines used in Japan.

49.     Maravai capitalized on CleanCap's moment. The Company held its Initial Public Offering in November 2020, raising $1.62 billion at a share price of $27 per share.

50.     Maravai had a meteoric rise as a public company. Its stock price rose as COVID-19 vaccinations peaked. The Company reported $799 million in revenue in 2021 and $883 million in 2022, with an estimated 68-70% of those revenues being directly attributable to COVID-19-related demand. The Company's stock price soared along with its revenues, briefly surpassing $60 per share in mid-August 2021.

### III.    *Maravai Struggles as COVID-19 Vaccine Demand Evaporates.*

51.     As the pandemic waned and vaccine production scaled down, however, Maravai's fortunes also faded. With demand drying up for CleanCap, the Company reported just $288.9 million in annual revenue in 2023, a 67% decline year-over-year, and well short of the $420 million to $460 million guidance it had provided at the start of the year, when it had estimated $100 million in CleanCap sales related to COVID-19. Maravai's 2023 revenue fell well below even the severely reduced guidance it issued halfway through 2023 of $300 million to $325 million.

52.     Maravai's NAP business segment, notwithstanding the decline in CleanCap revenues, remained the Company's most significant unit. NAP was responsible for approximately 78% of Maravai's overall revenue in 2023, and CleanCap mRNA products still accounted for 69% of that revenue.

53.     Without inflated COVID-19 revenues, Maravai would have to rely more on its core business. Unfortunately, the pandemic boom overshadowed serious headwinds. Maravai has

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

numerous competitors who have superior resources, and demand for its products other than CleanCap was relatively slow during and after the pandemic. For instance, while a decline in the Company's Nucleic Acid Production business segment was to be expected in 2023 given CleanCap fell under NAP's umbrella, the Company also reported an 8.2% decline in its other business segment: Biological Safety Testing.

54.    Moreover, hopes that the COVID-19 vaccinations' success would lead to a boom in mRNA vaccines proved premature. Neither Pfizer nor BioNTech released any new mRNA vaccines by the end of the Class Period, and approximately 75% of CleanCap applications are for pre-clinical products which are still in the research stage and have yet to be commercialized. For these reasons, analysts have called Maravai "among the most exposed companies" to "macro headwinds" which impact the "bioprocessing space."

55.    From November 2023 to January 2024, the Company carried out a restructuring plan that included laying off 15% of Maravai's workforce, among other measures taken to reduce the Company's expenses.

56.    Accordingly, Maravai appeared as if it had stalled out and was headed for a tailspin at the end of 2023. It became crucial for Maravai to "get back to consistently hitting financial targets," as RBC Capital Markets analysts wrote in a February 22, 2024 report, in order to regain investor confidence.

**IV.    *Maravai Begins to Regain Investor Confidence and Position Itself for a Favorable Acquisition by Hitting its Revenue Targets in Consecutive Quarters.***

57.    On February 22, 2024, Maravai announced its fourth quarter and full year 2023 financial results. "For the first time in recent memory," – *i.e.* since the second quarter of 2022 – as Jefferies wrote in a report issued that day, Maravai "beat" its revenue and EBITDA guidance for the fourth quarter of 2023. Maravai reported fourth quarter revenue of $74.1 million, exceeding the Company's prior guidance of $60 million to $70 million for the quarter. Maravai explained that its NAP business segment outperformed expectations in the quarter, thereby boosting the Company's revenue.

58.     Analysts were cautiously optimistic about Maravai's prospects following its fourth quarter 2023 revenue beat, believing it was a positive development that could serve as a "foundation for a return," as RBC Capital Markets wrote that day. Still, the pulse remained faint. The Company would have to "get back to consistently hitting financial targets" for there to be a clearer market signal of recovery.

59.     Other analysts echoed RBC's sentiments, seeing a glimmer of hope but opining that Maravai would have to continue executing to demonstrate the fourth-quarter revenue beat was the beginning of a trend rather than an aberration. In a February 23, 2024 report titled "Fourth-Quarter Beat and 2024 Revenue Guide Ahead of Consensus Feels Like a Turning Point ... Will Execution Follow?" for example, William Blair Research wrote: "After a tumultuous 2023, Maravai's beat and above-Street top-line guide came as a surprise … with a string of misses and guidance reductions finally coming to an end, we do believe the 2024 guide looks achievable. Overall, if the company executes on this guide, particularly in the second half of the year, we believe investors will be attracted back to a story that eventually will include midteens-plus growth." In a report issued on February 23, 2024, warily titled "Turning the Corner?" Jefferies posited that the "solid 4Q performance suggests the challenges of the past yr may have begun to stabilize."

60.     Maravai also provided guidance for Fiscal Year 2024 ("FY 2024") revenue in the range of $265.0 million to $285.0 million, and adjusted EBITDA margins in the range of 23% to 25%. On a February 22, 2024 earnings call, Defendant Herde projected that about 22% of the Company's 2024 revenues, or approximately $58.3 million to $62.7 million, would be achieved in the first quarter.

61.     Analysts, meanwhile, were commenting on Maravai's potential for a buy-out. RBC published a report on March 7, 2024 stressing Maravai's value as a strategic asset, "especially if they hit targets" for revenue and EBITDA margin in line with expectations for FY 2024.

62.     On May 8, 2024, Maravai issued a press release announcing its first quarter 2024 financial results, filed with the SEC on Form 8-K ("May 8, 2024 8-K"). Maravai disclosed quarterly

revenue of $64.2 million, ahead of the $62.7 million high-end guidance Herde provided on February 22, 2024.

63.    Also on May 8, 2024, the Company hosted its Q1 2024 earnings call. Herde reaffirmed Maravai's previously-issued revenue guidance for FY 2024 of $265.0 million to $285.0 million, telling investors Maravai expected higher revenue in the remaining quarters of 2024. He told investors that Maravai was estimating "close to 50%" of Maravai's annual revenue would come in the first two quarters of 2024. Maravai was therefore estimating, he said, much higher revenue for the second quarter: "about $73 million or so."

64.    Herde further explained, in response to an analyst question:

> I think if you just look – I'll just refer to the midpoints of our guidance for simplicity. That will see us printing revenue numbers on average of around $71 million for the next few quarters and EBITDA probably around average $19 million or so to get to the middle of that range. That would be 27-ish percent on average EBITDA margins for the next 3 quarters. There'll be some ebb and flow there, certainly, again, tied to some of these spikes and quarterly sequential moves on CleanCap and some of our higher-margin products.

> But I think you'll see, again, those sort of on average numbers and kind of moving again with revenue. Again, as we see it right now, you see we're saying that the second quarter here will likely be up in that, in the low 70s. That will probably carry a much higher margin, and then we'll kind of revisit the rest of the year as we get into it. But I think as we're looking at the business right now getting back into the type of margins we saw exiting Q4, certainly up in the 25 to 30 range is what we're looking to do. And certainly, that will be tied to the revenue profile of the business, particularly with the NAP segment.

65.    Herde's projection that 50% of Maravai's revenue would come in the first half of 2024 was an increase from the Company's earlier projection on February 22, 2024 that 47% of Maravai's annual revenue would come in the first half of the year. In a report published on May 9, 2024, Goldman Sachs wrote that it was "encouraged by the pull forward of guidance towards 1H24." The same day, William Blair similarly wrote that this "weight-shift of guidance to the first half (from 47% to 50%) [wa]s encouraging[.]" "[H]owever," the report continued, "we think the profitability ramp in the second quarter (as an indicator of future leverage) is important to build confidence in the post-COVID Maravai story. If the company can demonstrate fixed cost leverage and margin expansion, investor confidence in both near-term and long-term guidance (which calls for 40%-plus EBITDA margins) should improve."

66.     William Blair was far from the only market observer with its attention tuned to Maravai's next fiscal quarter. After two consecutive quarters in which Maravai had met or exceeded its revenue guidance, investors and analysts were eager to see whether the Company could sustain its apparent momentum. Analysts again expressed tempered optimism regarding Maravai's second-straight revenue beat. RBC Capital Markets published a report on May 8, 2024, titled "Reports Two Strong Quarters in a Row; One More and It's a Streak."

67.     The market was therefore tapped into Maravai's 2Q 2024 performance for signs as to whether or not the Company was truly stabilizing and, therefore, whether it could attract a favorable acquisition deal.

68.     It was notable, then, when Maravai issued a press release (filed with the SEC on Form 8-K) announcing its 2Q 2024financial results on August 7, 2024 ("August 7, 2024 8-K") in which the Company claimed to have met its guidance for the second quarter of FY 2024—but only just. The August 7, 2024 8-K reported second quarter revenue of $73.4 million, reaching the guidance Herde provided on Maravai's May 8, 2024 earnings call by a hair. Maravai's $73.4 million in second-quarter revenue was also just $1.7 million above analysts' consensus estimate of $71.7 million.

69.     Combined with the $64.2 million reported in the first quarter, Maravai's second quarter revenue of $73.4 million put the company at exactly 50.03% of the midpoint of its FY 2024 guidance range, also just barely achieving Herde's projection.

70.     After the close of trading on August 7, 2024, Maravai held its 2Q 2024 earnings call. In his opening remarks, Herde emphasized that Maravai had achieved "revenue in line with our expectations" for 2Q 2024. "Based on Q2 revenues being in line with our expectations," he told investors, Maravai "remain[ed] comfortable with the existing 2024 total revenue range of $265 million to $285 million." He further observed that the "$138 million in first half revenues" was roughly half of the "$275 million midpoint of our [guidance] range."

71.     Financial analysts perceived Maravai's apparent revenue streak to be an encouraging sign that the Company was recovering. In an August 7, 2024 report, Jefferies wrote: "Following three straight quarters of top-line beats, we see MRVI as getting its mojo back as COIVD-related headwinds subside and expect focus to shift toward base business . . . which should return to healthy

growth in '25 and beyond." KeyBanc published a report the same day commenting on Maravai's "Strong Revenue Result" and commenting that the consensus-beating revenue figure "signal[ed] a pickup in mRNA drug substance activity." RBC Capital Markets wrote that it was "encouraged" by Maravai's "revenue performance as the company progresses through the year." In a separate report issued the same day, RBC noted that Maravai's "streak of revenue beats continues," and "[w]ith solid Q2 results, MRVI's Triple Lindy -- 3 straight revenue beats and a return to positive growth -- should resonate well with investors."

72.    Analysts continued to remark on Maravai's apparent recovery the following day. On August 8, 2024, William Blair remarked: "Second quarter 2024 marks the third top-line beat in a row for Maravai, speaking to both end-market recovery and momentum in the underlying business after a challenged 2023 of misses and guides down." In a report titled "Right on Track for the Midpoint of 2024 Revenue Guidance," Deutsche Bank noted Maravai's second quarter revenue beat and opined that "the results are enough since Maravai remains in rarefied air among life sciences peers of maintaining its top-line outlook in 2024." The next day, August 9, 2024, Deutsche Bank remarked that the "Bigger picture" was that Maravai had "delivered top-line beats for 3 consecutive quarters and remains on track for 2024 revenue targets…"

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

73.    The Class Period starts on August 7, 2024.[1] On that day, Maravai issued a press release announcing its financial results for 2Q 2024:

**Financial Highlights:**

•*Quarterly revenue of $73.4 million, Net loss of $(14.5) million, and Adjusted EBITDA of $16.9 million*; and

•Reaffirmed revenue guidance for the full year 2024 in the range of $265.0 million to $285.0 million.

* * *

**Second Quarter 2024 Financial Results**

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

***Revenue for the second quarter was $73.4 million, representing a 6.5% increase over the same period in the prior year and was driven by the following:***

2

3

• Nucleic Acid Production revenue was $58.5 million for the second quarter, representing a 9.8% increase year-over-year. The revenue increase was primarily driven by higher demand for GMP CleanCap analogs, GMP mRNA, and our Glen Research product portfolio.

4

5

• Biologics Safety Testing revenue was $14.9 million for the second quarter, representing a 4.7% decrease year-over-year. The revenue decline was primarily due to lower demand trends in China.

6

7

Net loss and Adjusted EBITDA (non-GAAP) were $(14.5) million and $16.9 million, respectively, for the second quarter of 2024, compared to net loss and Adjusted EBITDA (non-GAAP) of $(11.9) million and $9.1 million, respectively, for the second quarter of 2023.

8

9

(emphasis added)

10

74.     The italicized statements identified in ¶73 above were materially false, misleading and

11

omitted material facts because Maravai's 2Q 2024 revenue was overstated by at least $3.977 million.

12

As the Company later admitted on February 25, 2025, and further explained on March 18, 2025,

13

Maravai had improperly recorded nearly $4 million in revenue in 2Q 2024 upon shipment of goods

14

in the final week of that quarter which should have been recorded in the first week of the third quarter

15

of 2024 upon receipt by the customer. Coming into the quarter, analysts had remarked that the

16

Company would have to hit its financial targets for several consecutive quarters in order to show

17

investors that its business was stabilizing. Showing that the company was positioned to meet its FY

18

2024 revenue would make a potential acquisition of Maravai more likely and more favorable. By

19

overstating its 2Q 2024 revenue by $3.977 million, Maravai was able to present itself as though it

20

had met its own guidance and the revenue expectations of analysts for a third-straight quarter.

21

Without the additional ~$4 million in revenue pulled into 2Q 2024, Maravai would have missed

22

Defendant Herde's revenue guidance of $73 million in 2Q 2024 and the "encouraging" sign that, as

23

Herde projected, Maravai had met 50% of its revenue target for the year by the end of the first half.

24

Maravai further conceded on March 18, 2025, that it failed to "design and maintain effective controls

25

over the timing of when the Company has transferred control of goods to its customers at period

26

end," among numerous other internal control issues related to revenue recognition and the accuracy

27

of information entered into the Company's IT systems. Maravai's auditors reported that auditing the

28

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Company's sales was "challenging" due to the "effort required" to assess whether incentives were provided to customers but "not properly recognized."

75.    Defendants Herde and Martin either knew, or recklessly disregarded, that Maravai improperly recorded $3.977 million in revenue in its Q2 2024 financial results. First, both were aware of the expectations for Maravai to meet or exceed revenue guidance and, recording the revenue from this sale, which occurred on the last week of the 2024 Second Quarter, allowed Maravai to beat guidance instead of missing it. Second, the terms of the $3.977 million sale, as Herde would subsequently confirm, required revenue to be recognized when the product was received by the customer, so a review of the sales terms would have confirmed that the revenue should not have been recognized in the Second Quarter of 2024. Third, given Maravai's inadequate internal controls regarding revenue recognition, Herde and Martin either knew, or were reckless, in not ensuring that last minute revenue, which took Maravai from missing to beating revenue expectations, was properly recorded in accordance with the terms of the sales agreement.

76.    On August 8, 2024, the Company submitted its quarterly report for the period ended June 30, 2024, on a Form 10-Q filed with the SEC ("August 8, 2024 10-Q"), which was signed by Defendant Herde. The August 8, 2024 10-Q affirmed the previously reported financial results in its consolidated financial statements, stating: "We generated total consolidated revenue of $73.4 million and $137.6 million for the three and six months ended June 30, 2024, respectively…"

77.    The statements identified above in ¶76 were materially misleading and omitted material facts for the same reasons identified in ¶74. As the Company later admitted, the $73.4 million in revenue it reported in 2Q 2024 was overstated by $3.977 million.

78.    The August 8, 2024 10-Q further stated the following regarding the Company's Evaluation of Disclosure Controls and Procedures, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of

the end of the period covered by this Quarterly Report on Form 10-Q. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2024.***

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the three months ended June 30, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(emphasis added)

79.    The italicized statements identified in ¶78 above were materially misleading and omitted material facts because, as Maravai later acknowledged on February 25, 2025 and explained more fully on March 18, 2025, the Company's disclosure controls and procedures were "ineffective" during the Class Period. Maravai's auditors "expressed an adverse opinion" on the effectiveness of "the Company's internal control over financial reporting as of December 31, 2024." Maravai further clarified that "Management did not design and operate effective controls over the Company's revenue process" nor over "the key inputs and assumptions that were utilized to determine the fair value of reporting units in the Company's quantitative goodwill impairment assessment…" Maravai further disclosed that it would institute a "Remediation Plan" to address numerous deficiencies in the Company's reporting.

80.    Also on August 8, 2024, Maravai hosted its second quarter earnings call ("August 8, 2024 Earnings Call"). Defendant Martin stated in his opening remarks: "Today, ***we reported $73 million in revenue for Q2***, $17 million in total adjusted EBITDA and $0 in adjusted fully diluted EPS for the quarter. Our Nucleic Acid Production segment had revenue of $58 million in Q2. The Biologic Safety Testing revenue was $15 million in the second quarter."

81.     The italicized statement identified above in ¶80 were materially false, misleading and omitted material facts for the same reasons identified in ¶74. As the Company later admitted, the $73.4 million in revenue it reported in 2Q 2024 was overstated by $3.977 million.

82.     During the August 8, 2024 Earnings Call, Defendant Herde stated: "Overall, Q2 was solid with *revenue in line with our expectations* . . . . Based on *Q2 revenues being in line with our expectations* and our current assessment of the likely range of revenue outcomes for the year, we remain comfortable with the existing 2024 total revenue range of $265 million to $285 million" (emphasis added).

83.     The statements identified above in ¶82 were materially false, misleading and omitted material facts for the same reasons identified in ¶74. In the run up to 2Q 2024, the market was attuned to whether Maravai would be able to extend its run of guidance beats into a true streak, thereby indicating a return to stability that would bolster investor confidence and make the Company a more attractive target for acquisition. But Maravai had not achieved "revenue in line with our expectations." Instead, it had improperly pulled nearly $4 million in revenue forward from the third quarter of 2024.

84.     On November 7, 2024, Maravai issued a press release, filed with the SEC on Form 8-K ("November 7, 2024 8-K"), announcing its financial results for the third quarter of 2024, which stated in relevant part:

Financial Highlights:

• *Quarterly revenue of $65.2 million, Net loss of $(176.0) million (including a goodwill impairment of $154.2 million*), and Adjusted EBITDA of $12.7 million; and

• Updated revenue guidance for the full year 2024 to be in the range of $255.0 million to $265.0 million.

\* \* \*

**Third Quarter 2024 Financial Results**

*Revenue for the third quarter was $65.2 million, representing a 2.5% decrease over the same period in the prior year and was driven by the following*:

• Nucleic Acid Production revenue was $49.9 million for the third quarter, representing a 2.5% decrease year-over-year. The revenue decrease was primarily driven by lower demand for research and discovery products.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

• Biologics Safety Testing revenue was $15.3 million for the third quarter, representing a 2.5% decrease year-over-year, primarily due to lower demand in the bioprocessing market.

Net loss and Adjusted EBITDA (non-GAAP) were $(176.0) million and $12.7 million, respectively, for the third quarter of 2024, compared to net loss and Adjusted EBITDA (non-GAAP) of $(15.1) million and $11.9 million, respectively, for the third quarter of 2023.

(emphasis added)

85.     The statements identified above in ¶84 were materially misleading and omitted material facts for the same reasons identified in ¶74. Maravai underreported revenue in the third quarter of 2024 in order to pull nearly $4 million forward into 2Q 2024.

86.     On November 12, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "3Q24 10-Q").

87.     The 3Q24 10-Q stated the following regarding the Company's Evaluation of Disclosure Controls and Procedures, in relevant part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of September 30, 2024.***

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, during the

21

three months ended September 30, 2024 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(emphasis added)

88.    The italicized statements identified above in ¶87 were materially misleading and omitted material facts for the reasons described in ¶79. Defendants failed to disclose to investors that Maravai lacked adequate internal controls over financial reporting related to revenue recognition and goodwill, and, as a result, the Company inaccurately recognized revenue and misstated its goodwill during fiscal 2024.

89.    On December 5, 2024, Maravai announced that Carl Hull would retire from his position as the Company's Executive Chairman of the Board and be succeeded by R. Andrew Eckert. An analyst note published by William Blair noted Eckert's "extensive track record of leading companies to acquisition as an executive." This suggested that Maravai was attempting to position itself for potential acquisition.

**DISCLOSURES AT THE END OF THE CLASS PERIOD**

90.    On February 25, 2025, before the market opened, Maravai issued a press release, postponing its fiscal 2024 earnings release and announcing it would delay filing its annual report on Form 10-K for the fiscal year ended December 31, 2024. Specifically, the press release stated, in relevant part:

Maravai LifeSciences Holdings, Inc. (Maravai) (NASDAQ: MRVI), a global provider of life science reagents and services to researchers and biotech innovators, today announced that it is postponing its previously announced earnings release and call scheduled for February 25, 2025. It also announced that it intends to file a Form 12b-25, Notification of Late Filing, with the U.S. Securities and Exchange Commission and will delay the filing its annual report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 Form 10-K"). Maravai intends to hold its postponed earnings call and to file the 2024 Form 10-K as soon as practicable and on or before March 18, 2025, prior to the expiration of the automatic extension of fifteen calendar days from the original 2024 Form 10-K due date of March 3, 2025.

Maravai requires additional time to complete its year-end financial close process for reasons related primarily to the following items. First, Maravai requires additional time to complete its assessment of a potential non-cash impairment charge related to goodwill associated with its previous acquisition of Alphazyme LLC. Second, Maravai requires additional time to assess an error identified during the close process with respect to revenue recognition associated with a single shipment identified in year-end audit procedures that resulted in approximately $3.9 million in revenue being recorded in the final week of the second quarter of 2024 upon shipment when it should have been recorded in the first week of the third quarter of 2024 upon receipt by the

customer. This revenue recognition error is not expected to impact fullyear 2024 revenue, which Maravai still expects to be near the mid-point of the previously announced guidance range of $255.0 million and $265.0 million. Third, Maravai requires additional time to complete its assessment of the effectiveness of its disclosure controls and procedures and internal controls over financial reporting as of December 31, 2024, and any remediation, including with respect to remediation of a material weakness in its internal controls over revenue recognition identified by management.

91.    Analysts reacted negatively to Maravai's earnings postponement, commenting that the Company would once again have to show consecutive quarters of positive financial results in order to convince the market it had regained stability. RBC Capital Markets wrote on February 25, 2025 that the postponement "*adds uncertainty to the Maravai's [sic] story and that Maravai needs to execute against guidance for several quarters before investors regain confidence in the long term growth and margin potential…*" (emphasis in original). The same day, William Blair analysts wrote that the "last-minute delay" was "yet another hit to investor confidence," adding "given the track record here, we think the company will have to stack up several quarters of improving results in a row before the stock starts to durably outperform."

92.    Wells Fargo analysts Brandon Couillard also commented on the unusual, last-minute timing of the earnings postponement. On February 25, 2025, he published a report stating: "would not be surprised to see shares trade lower as investors contemplate the potential for additional disruption. This is particularly true given the timing of the announcement with MRVI set to report earnings today after the close. The question becomes, what took management so long to identify these issues? **Did they know about them but thought they could solve them in time or did they just identify the issue?**" (emphasis added).

93.    On this news, the Company's share price fell $0.87 or 21.70%, to close at $3.14 per share on February 25, 2025, on unusually heavy trading volume.

94.    The next morning, February 26, 2025, Robert W. Baird downgraded Maravai from an "Outperform" rating to "Neutral" and slashed its price target by 66%, from $9.00 to $3.00.

95.    On March 4, 2025, Maravai filed a Form 12b-25 with the SEC announcing that it would be unable to file its 10-K annual report for Fiscal Year 2024 by the prescribed due date of March 3, 2025 (the previous day). The Company explained that it (1) had "not yet completed its

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

assessment" of the impairment charge related to the goodwill associated with Alphazyme; (2) needed "additional time to complete its assessment" of the impact of the error by which $3.9 million was improperly recorded in the final week of 2Q 2024, and (3) that the Company was still reviewing its internal controls and possible "remediation steps."

96.    The Form 12b-25 further announced that Maravai was assessing an additional "potential non-cash charge related to excess and obsolete inventory for Alphazyme" and that the Company's "preliminary assessment" indicated an approximately $12 million impairment charge for the goodwill alone.

97.    On March 5, 2025, William Blair published a report commenting that Maravai's "inability to timely file its 10-K likely serves as yet another hit to investor confidence following last week's announcement to postpone fourth-quarter results."

98.    On March 18, 2025, Maravai belatedly released its Fourth Quarter and Full Year 2024 financial results on a Form 8-K filed with the SEC. The Company recorded an $11.9 million goodwill impairment in Q4 2024.

99.    Also on March 18, 2025, Maravai filed its late 2024 10-K with the SEC ("2024 10-K").

100.   The 2024 10-K contained a report from Maravai's auditor, E&Y. E&Y explained that it had audited "the Company's internal control over financial reporting as of December 31, 2024" and the report it was publishing "expressed an adverse opinion thereon."

101.   As for the revenue improperly recorded in 2Q 2024, E&Y explained that auditing Maravai's sales to distributors "was challenging" due to "the effort required to audit the respective sales activity to assess whether incentives were provided that were not properly recognized."

102.    The 2024 10-K contained a restatement of Maravai's financials for 2Q 2024 and 3Q 2024 and conceded that the previous revenue figures for those quarters were misstated by $3.977 million because of an order which was recorded upon shipment in 2Q 2024 even though the customer did not receive possession until 3Q 2024:

| | Three Months Ended June 30, 2024 (Unaudited) | | |
|---|---|---|---|
| | As Reported | Adjustments | As Restated |
| Revenue | $ 73,400 | $ (3,977) | $ 69,423 |
| Operating expenses: | | | |
| Cost of revenue | 38,271 | 311 | 38,582 |
| Selling, general and administrative | 40,556 | — | 40,556 |
| Research and development | 5,284 | (360) | 4,924 |
| Change in estimated fair value of contingent consideration | (1,195) | — | (1,195) |
| Restructuring | (4) | — | (4) |
| Total operating expenses | 82,912 | (49) | 82,863 |
| Loss from operations | (9,512) | (3,928) | (13,440) |
| Other income (expense): | | | |
| Interest expense | (11,939) | — | (11,939) |
| Interest income | 7,086 | — | 7,086 |
| Other expense | (2,562) | — | (2,562) |
| Loss before income taxes | (16,927) | (3,928) | (20,855) |
| Income tax benefit | (2,435) | — | (2,435) |
| Net loss | (14,492) | (3,928) | (18,420) |
| Net loss attributable to non-controlling interests | (6,907) | (1,724) | (8,631) |
| Net loss attributable to Maravai LifeSciences Holdings, Inc. | $ (7,585) | $ (2,204) | $ (9,789) |
| | | | |
| Net loss per Class A common share attributable to Maravai LifeSciences Holdings, Inc., basic and diluted | $ (0.05) | $ (0.02) | $ (0.07) |
| Weighted average number of Class A common shares outstanding, basic and diluted | 135,842 | — | 135,842 |

103.    Regarding internal controls, the 2024 10-K stated:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting . . . Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2024. Based on the results of this evaluation, **our management concluded that our internal control over financial reporting was ineffective as of December 31, 2024**, because we identified the following material weaknesses:

• *Revenue and accounts receivable*: **Management did not design and operate effective controls over the Company's revenue process**. Specifically, **we did not design and maintain effective controls over the timing of when the Company has transferred control of goods to its customers at period end, segregation of duties related to customer purchase order information entered into the Company's IT systems, accounting for customer product revenue, and the authorization and documentation of pricing approvals**. The material weakness is an aggregation of these matters.

(emphasis added)

104.    The 2024 10-K included a "Remediation Plan" for the material weaknesses, which included: "Designing and implementing new controls to sufficiently document evidence of pricing authorization and approvals;" "[r]eviewing order entry data input into IT systems to ensure

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

accuracy," "[r]eviewing shipping terms as a factor in determining the timing of when control of goods is transferred to customers at period end," and "[m]onitoring work order activity related to custom product manufacturing."

105.    On this news, Maravai's stock price fell from a closing price on March 18, 2025 of $2.58 to close at $2.43 the following day, March 19, 2025, a decline of 15 cents or 5.8%.

106.    Two days later, on March 20, 2025, Maravai held a conference call with analysts to discuss its fourth quarter and FY 2024 earnings. Defendant Herde acknowledged, though downplayed, the revenue pull-forward:

> [A]n error was identified during the year-end financial close process with respect to revenue recognition timing associated with a single shipment that resulted in approximately $3.9 million in revenue being recorded in the final week of the second quarter of 2024 upon shipment when it should have been recorded in the first week of the third quarter of 2024 upon receipt by the customer. Our contractual order terms typically result in revenue recognition upon shipment. However, the terms for this particular order were different, and that difference was not communicated timely to our accounting team. Based on the shipping terms for this order, we should have recognized revenue upon receipt of the shipment by the customer or about a week later than we did.

107.    Following the conference call on March 20, 2025, Jefferies analyst Matthew Stanton wrote that Maravai would have to "rebuild some level of credibility (which has diminished plenty already)."

## LOSS CAUSATION/ECONOMIC LOSS

108.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the Class.

109.    On February 25, 2025, Maravai revealed that it would require additional time to file its annual report for 2024 on Form 10-K in order to assess a non-cash impairment charge related to goodwill and a $3.9 million transaction which was improperly pulled-forward into the Company's second quarter 2024 financial reporting from the third quarter of 2024. On this news, Maravai's stock declined 21.70%, or 0.87 per share, on unusually heavy trading volume

110.    The decline in Maravai's stock price is directly attributable to the corrective disclosure announcing that the Company needed time to assess whether its 2Q 2024 revenue had been improperly inflated as a result of possible deficiencies in the Company's internal controls.

111.    Then, on March 18, 2025, the Company filed its March 18, 2025 10-K with the SEC, which restated Maravai's 2Q 2024 revenue downwards by $3.977 million and recorded an $11.9 million goodwill impairment to Alphazyme. The March 18, 2025 10-K also acknowledged management had failed to "design and operate effective controls over the Company's revenue process."

112.    On this news, Maravai's stock price fell from a closing price on March 18, 2025 of $2.58 to close at $2.43 the following day, March 19, 2025, a decline of 15 cents or 5.8%.

113.    Then, on March 20, 2025, after market close, Maravai held an earnings call to discuss its year-end results. During the call, Defendant Herde explained that according to "the shipping teams for th[e] order" pulled forward into 2Q 2024, "we should have recognized revenue upon receipt of the shipment by the customer or about a week later than we did." He further acknowledged: "we did not maintain effective controls over our revenue process and our goodwill impairment assessment process and thus have identified these as material weaknesses in internal control over financial reporting."

114.    On this news, Maravai's stock price fell 14 cents, from a closing price on March 20, 2025 or $2.40 to close at $2.26 the following day, March 21, 2025, a 5.8% decline.

## ADDITIONAL SCIENTER ALLEGATIONS

115.    As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Maravai common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Maravai, their control over, and/or receipt or modification of, the Company's allegedly materially misleading misstatements, and/or their associations with the Company that

made them privy to confidential proprietary information concerning Maravai, participated in the fraudulent scheme alleged herein.

116.   As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## I.    *Maravai's Potential as a Strategic Acquisition Target Created a Motive to Pull Forward Revenue to Hit Guidance.*

117.   Maravai entered FY 2024 struggling to hit financial targets that were greatly reduced from prior years. The business was in a precarious and deteriorating situation. In fact, Maravai would not achieve its revenue guidance for FY 2024, but by pulling nearly $4 million forward from the second half of the year to the first, the Company was able to make itself look as though it was on track to hit its targets for a third straight quarter. This allowed the Company to portray itself as an attractive acquisition target, which could have saved Maravai from its decline.

118.   On August 16, 2024, a little over a week after Maravai reported 2Q 2024 revenue figures that appeared to show a streak of three straight revenue beats, *Reuters* issued a news report which speculated that Repligen Corp, a large producer of drug manufacturing tools, had made an offer to acquire Maravai. Neither Repligen nor Maravai commented on or confirmed the veracity of the *Reuters* story.

119.   Commenting on the *Reuters* article, RBC called Maravai a "good strategic takeout candidate given its unique product offering" and speculated that a Repligen takeover could come at a price of $15 to $20 per share, a substantial 55% to 107% premium on Maravai's closing price on August 16, 2024 of $9.68 per share. Niether Maravai nor Repligen ever publicly confirmed that Repligen had made an offer to aquire Maravai in 2024 or any potential acquisition price.

120.   *Reuters* noted that Maravai had "become a takeover target after it lost nearly 80% of its value from its August 2021 peak." Indeed, Maravai's potential to be bought-out had long been a bulwark for the stock's value. In February 2022, while COVID-19 related demand for CleanCap was still high, German biopharmaceutical company Sartorius AG reportedly made an $11 billion offer to acquire Maravai. The Company reportedly rejected the offer as being too low.

121.    Maravai's suitability as an acquisition target assumed new importance to the Company's value after the COVID-19 pandemic subsided. The possibility that the Company could be acquired created an inherent opportunity that bolstered its prospects as an investment even while its financial metrics fell back to Earth, and could serve as a parachute if the Company was not able to fully stabilize. Writing on October 3, 2022, for instance, Credit Suisse emphasized that its "conversations on Maravai has been disproportionately with investors who view the company as an acquisition target."

122.    On May 16, 2023, *Reuters* reported that a week after Maravai cut its 2023 revenue guidance, private equity firm, Thomas H. Lee Partners, had approached Maravai with an acquisition offer. Maravai rejected the offer, according to *Reuters*. "Nevertheless, the acquisition approach show[ed] how Maravai ha[d] become a takeover target after it lost three-quarters of its value from its August 2021 peak…"

123.    Two months later, on July 14, 2023, *SeekingAlpha* reported that Merck KGaA had shown interest in Maravai as an acquisition target. On July 24, 2023, Equity research firm Equisights published a report on the takeover interest in Maravai. Equisights wrote, in part:

> Maravai LifeSciences Holdings, Inc. has recently garnered significant attention in the biotech industry amid rumors of acquisition interest from Germany's Merck KGaA. This development has shed light on the company's strong growth drivers, recent business highlights, and financial performance.
>
> Maravai's potential acquisition by Merck KGaA has created a buzz in the biotech sphere, positioning the company as an attractive target. While Maravai had previously rejected an offer from private equity firm Thomas H. Lee, this new development presents a fresh twist in the unfolding narrative. Other potential acquirers such as Thermo Fisher Scientific Inc and Danaher Corporation have also shown interest, reflecting Maravai's compelling value proposition. The acquisition interest validates Maravai's market position and growth potential.
>
> *            *            *
>
> Despite facing challenges in Q1 2023, Maravai continues to exhibit solid financial performance. The company's revenue for the quarter was $79.0 million, representing a significant decrease of 67.7% compared to the previous year. This decline can be attributed to reduced demand for COVID-19 related products, particularly the CleanCap product line. However, Maravai's commitment to diversify its revenue streams beyond COVID-19 related products positions the company for future growth.

124.   On January 2, 2024, Equisights again commented on Maravai being "a notable acquisition target," writing that the Company was "attracting interest from larger companies, with its stabilized EBITDA and an enterprise value enhancing its appeal."

125.   An important factor in Maravai's acquisition interest, as well as its leverage in any negations, was the Company's ability to stabilize its business and hit financial targets.

126.   On March 7, 2024, for example, RBC had published a report titled "Why We Still Like QDEL and MRVI" which explained in part that Maravai was a "take-out candidate[] by a strategic or financial buyer." RBC elaborated: "we think MRVI would be an attractive acquisition target given their strategic importance in cell & gene therapy drug development; along with sector high growth and margin potential."

127.   The "margin potential" which would make Maravai an attractive acquisition target would naturally be a function of its revenue. "Revenue growth," RBC wrote, "will be the ultimate driver of margin expansion for MRVI." In a graphic labeled "Exhibit 5," RBC showed estimated revenues for Maravai in FY 2024 of $277.8 million:

Exhibit 5 - MRVI Margin Build - 2025 and LRP

| MRVI - EBITDA Margin Math for 2025 | | | | |
|---|---|---|---|---|
| Based on RBC estimates for FY'24 and FY'25 FYE Dec. $M | | | | |
| 2025 Bridge | FY'24'E | 2H'24E Annualized | Change | FY'25'E |
| Revenues | 277.8 | 294.2 | 22.3 | 316.5 |
| EBITDA | 65.4 | 83.8 | 9.0 | 92.8 |
| EBITDA margin | 23.5% | 28.5% | 40.6% | 29.3% |
| MRVI - EBITDA Margin Math for LT Targets | | | | |
| Based on September 2023 analyst day targets and RBC estimates FYE Dec. $M | | | | |
| 2028 Bridge | | FY'25 RBC Est | Change | FY'28 LRP |
| Revenue | | 316.5 | 383.5 | 700.0 |
| EBITDA | | 92.8 | 187.2 | 280.0 |
| EBITDA margin | | 29.3% | 48.8% | 40.0% |

Source: RBC Capital Markets estimates, company reports. FY'28 LRP are company targets ($700m+ in revenue and ~40% EBITDA margins) from September 2023 R&D Day, which have not been re-confirmed by the company following Q3'23 guidance cut; shown here for illustrative purposes.

128.   RBC further explained that showing solid revenue would be key for Maravai's value proposition to an acquisition partner:

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

> From a strategic perspective, we think many of the big players with bioproduction exposure would be interested in MRVI - especially if they hit targets we laid out in exhibit 5 - and have the balance sheet to acquire MRVI. Specialty bioproduction M&A multiples have ranged from 30x - 80x EBITDA, which bodes well for MRVI's strategic value.

129.    Maravai's $73 million in recorded revenue for 2Q 2024, announced a week before *Reuters* reported on Repligen's acquisition interest, put the Company's first-half revenues at $138 million dollars. Extrapolating from Defendant Herde's representation that 50% of the Company's revenues would come in the first half of 2024, the $138 million in first-half revenue appeared to put Maravai on pace for $276 million in annual revenue, or $280 million if Maravai achieved the "average" quarterly revenue of $71 million Herde projected on May 8, 2024, either nearly reaching or exceeding the target RBC shared in its "Exhibit 5" as a key consideration for potential suitors.

130.    Accordingly, by overstating its revenue in 2Q 2024 to demonstrate a steak of consistently beating guidance, Maravai created an impression of a company regaining financial stability with a positive outlook and opportunities for growth. Defendants made Maravai appear to be an attractive target with long-term prospects.

## II.    *The Individual Defendants Were Responsible for and on Notice of Deficiencies in Maravai's Internal Controls*

131.    Maravai's 2024 10-K conceded that the Company's "management is responsible for establishing and maintaining adequate internal control over financial reporting," but that "[m]anagement," *i.e.* the Individual Defendants, Herde and Martin, "did not design and operate effective controls over the Company's revenue process" and "did not operate effective controls over the key inputs and assumptions" used in goodwill impairment assessment. The inadequacies in Maravai's internal controls, therefore, would have been obvious to the Individual Defendants when they nevertheless represented to investors that they had evaluated Maravai's internal controls and "concluded that our disclosure controls and procedures were effective…"

132.    The inclusion of a step as simple as "[r]eviewing shipping terms" to determine when shipped goods may be counted as revenues at the end of a financial reporting period in the Company's "Remediation Plan" outlined in the 2024 10-K confirms that the problems with Maravai's accounting were so obvious that their occurrence supports an inference of scienter.

133.   Moreover, the Individual Defendants were on notice that the Company's internal controls might be ineffective because both before and during the Class Period, the SEC sent correspondence to Defendant Herde observing potential deficiencies in the Company's financial reporting.

134.   Starting on June 12, 2024, the SEC addressed a letter to Defendant Herde stating, among other things, "it appears your Adjusted Free Cash Flow measure could reflect the inappropriate comingling of performance and liquidity measures. Please revise or advise us your basis for determining this measure is appropriate as it is presented." The SEC closed the letter, "we remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures…"

135.   On June 25, 2024, Defendant Herde responded to the SEC by letter. Herde disputed that Maravai's Adjusted Free Cash Flow reporting comingled performance and liquidity, but agreed "in future filings, to enhance the narrative description of Adjusted Free Cash Flow to more clearly indicate that Adjusted Free Cash Flow is a performance measure and is not intended to be a cash flow or liquidity measure."

136.   The SEC replied to Herde by letter on July 19, 2024. Regarding Adjusted Free Cash Flow, the SEC again expressed concern that the Company's treatment of the measure did "not appear to be appropriate."

137.   The SEC added a new concern in its July 19, 2024 correspondence concerning how Maravai was accounting for retention payments it had set aside for certain key personnel in businesses the Company had acquired:

> We note that you use Adjusted EBITDA to evaluate the financial performance of your business and that it is a component of the financial covenant under your credit agreement. We also note that there is an adjustment for Acquisition Integration Costs which includes retention payments incurred in connection with completed acquisitions. With regards to Adjusted EBITDA as a non-GAAP performance measure, please quantify and describe the nature of these retention payments and tell us how you considered whether these are normal, recurring, cash operating expenses necessary to operate your business.

138.   In summary, Maravai had agreed to make bonus payments to certain key employees of companies it acquired to retain them. Alphazyme was one such acquisition with retention

32

1  payments, and was therefore implicated by the SEC's comment. The payments at issue would be

2  paid out over time, but Maravai chose to exclude them as a cost for the purposes of its Adjusted

3  EBITDA calculation. The SEC was concerned that this adjustment was inappropriate.

4    139.  By letter dated August 16, 2024, Herde responded to the SEC. First, Herde agreed to

5  remove the contested Adjusted Free Cash Flow figure from future filings altogether. Second,

6  concerning the retention payments, Herde wrote that Maravai had made two "strategic acquisitions

7  that included one-time agreements to make retention payments to key personnel to facilitate closing

8  of the transactions." The first acquisition was of MyChem, LLC, and the second was the January

9  2023 acquisition of Alphazyme which involved an agreement to pay up to $10 million in bonuses to

10  key Alphazyme personnel if they remained with the Company following the merger. Herde wrote

11  that it was "appropriate" to exclude these payments from the Company's Adjusted EBITDA

12  measure.

13    140.  The SEC disagreed. By letter dated September 17, 2024, the SEC again expressed

14  concerns with Maravai's treatment of its acquisition retention payments with respect to Alphazyme

15  and MyChem:

16      Based on the information provided, the retention payments negotiated in the
       acquisitions of MyChem and Alphazyme appear to be normal, recurring operating
17      expenses necessary to operate your business. As such, we believe the adjustments for
       the retention payments are not consistent with Question 100.01 of the Compliance and
18      Disclosure Interpretations related to non-GAAP measures. Please remove the
       adjustments for retention payments from your presentation of Adjusted EBITDA as a
19      non-GAAP performance measure.

20  The SEC once again closed its letter by "remind[ing] [Maravai] that the company and its management

21  are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review,

22  comments, action or absence of action by the staff."

23    141.  On February 19, 2025, Defendant Herde responded on behalf of Maravai by letter.

24  Herde resisted the SEC's command to remove the retention payment adjustments from Maravai's

25  Adjusted EBITDA measure, arguing that the "particular facts and circumstances unique to the

26  Company" made it unnecessary to factor the payments into Adjusted EBITDA. According to Herde,

27  the payments were "not normal and recurring operational expenses," and in any case were

28

1  "immaterial." Although they would be paid out "ratably each quarter through December 31, 2025,"

2  the retention payments were specifically tied to the two acquisitions and not the "ongoing

3  operations" of the Company.

4      142.   The SEC responded the next day, February 20, 2025, with a two-sentence letter which

5  read simply: "We have completed our review of your filing. We remind you that the company and

6  its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding

7  any review, comments, action or absence of action by the staff."

8      143.   Accordingly, starting two months before the start of the Class Period, Defendants were

9  put on notice that the Company's internal controls over financial reporting may be deficient. The SEC

10  repeatedly expressed concerns during the Class Period that the Company's accounting may be not be

11  "appropriate." The SEC had even specifically expressed concern with respect to the Company's

12  accounting related to its acquisition of Alphazyme a month before the Class Period, insinuating that

13  the Company was inappropriately excluding certain costs to boost its EBITDA figure.

14  ### III.    *The Individual Defendants Were Uniquely Personally Motivated to Push Maravai to Appear to Have Regained Financial Health*

16      144.   As of March 17, 2025, Martin owned 1,814,643 shares of Maravai common stock.

17  Herde owned 674,636 shares of Maravai common stock as of May 15, 2025. Both Individual

18  Defendants had strong personal financial incentives to inflate the Company's share price by ensuring

19  the Company was meeting market expectations and appeared to be an attractive target for potential

20  acquisition.

21      145.   Additionally, Maravai's Board was in the process of considering potential

22  replacements for Martin as CEO. In call with Maravai's management in early June 2025, following

23  the announcement that Martin would be replaced as CEO, Wells Fargo learned that "the Board

24  reportedly considered multiple candidates in a full search process that was several months long" and

25  that Martin had "faced an uphill battle from the jump." In a Flash Note published June 9, 2025,

26  Guggenheim reported that Maravai's management said Martin's replacement "was a decision the

27  board considered for a few months." As a member of the Board, Martin was likely aware that the

28

Company was considering his possible replacement during the Class Period and that his position as CEO was potentially in jeopardy if the Company failed to meet its financial targets.

146.    In short, both Individual Defendants were motivated by personal financial considerations to make Maravai appear as though it was meeting revenue expectations and had regained financial health and was therefore an attractive acquisition under their leadership in order to keep their positions with the Company.

## IV.    The Restatement of the Company's Financial Statements Came Quickly After a Change in Company Leadership

147.    As noted above, on December 5, 2024, Maravai announced R. Andrew Eckert had been appointed as Chairman of Maravai's Board and Eckert had an extensive track record of leading companies to acquisition.

148.    The rapid disclosure of financial irregularities within Maravai's previously issued SEC filings, less than two months into the first financial reporting period following the change in the Company's leadership, supports an inference of scienter—suggesting that the problems with Maravai's previously recognized revenue were readily apparent upon review.

## V.    The Individual Defendants Were Quickly Replaced by the Company Following the Disclosures of Financial Irregularities

149.    Shortly after the disclosures described above, Maravai cleaned house. On June 8, 2025, Maravai announced that the Board of Directors had appointed Bernd Brust to replace Martin as CEO "effective immediately." In the same announcement, the Company announced it was neither reaffirming nor withdrawing its previously issued 2025 guidance.

150.    Analysts reacted to the change with surprise. William Blair characterized Martin's replacement by saying the Company had "abruptly moved on" from Martin. Wells Fargo observed that Maravai's simultaneous announcement that it was neither reaffirming nor withdrawing its previously issued 2025 guidance was an "atypical move, especially for such an abrupt transition." Guggenheim attributed the Company's comment on guidance in part to "the abrupt nature of the transition."

35

151.    On June 25, 2025, Maravai announced Rajesh Asarpota would takeover as CFO effective June 30, 2025, and that Herde would transition to an "advisory role" on the same date. Again, Maravai noted it was neither reaffirming nor withdrawing its previously issued 2025 guidance.

152.    An analyst note published by William Blair June 26, 2025, described the changes as Maravai "complet[ing] a clean sweep of leadership."

153.    Then, on July 18, 2025, the Company appointed Deloitte & Touche as Maravai's independent registered public accounting firm, effective immediately, dismissing Ernst & Young which had served as the Company's auditor throughout the Class Period. In the same announcement, Maravai reiterated its previous disclosure that Ernst & Young's report on internal control over financial reporting as of December 31, 2024, included an adverse opinion, citing material weaknesses related to revenue, accounts receivable, and goodwill impairment.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

154.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

    a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b) The omissions and misrepresentations were material;

    c) The Company's common stock traded in efficient markets;

    d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    e) Lead Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

155.    At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and

36

(ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Lead Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

156.   The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not forward-looking and/or were not identified as forward-looking statements when made.

157.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**CLASS ACTION ALLEGATIONS**

158.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Maravai common stock between August 7, 2024 through February 24, 2025, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

159.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Maravai's shares actively traded on the NASDAQ. While the exact number of shares is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Maravai shares were traded publicly during the Class Period on the NASDAQ. Record owners and other

members of the Class may be identified from records maintained by Maravai or its transfer agent and may be notified of the pendency of this action by mail.

160.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a)    Whether Defendants violated the Exchange Act;

b)    Whether Defendants omitted and/or misrepresented material facts;

c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e)    Whether the price of the Company's stock was artificially inflated; and

f)    The extent of damage sustained by Class members and the appropriate measure of damages.

161.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

162.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

163.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

164.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

165.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

166.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

167.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

168.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

169.    Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Lead Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

170.    As set forth above, Maravai and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position

39

as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory and punitive damages in favor of Lead Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.    Awarding Lead Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D.    Awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Lead Plaintiff hereby demands a trial by jury.

July 29, 2025

Respectfully submitted,

*/s/ Jacob A. Walker*
Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo CA 94402
(650) 781-0025
jake@blockleviton.com

40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey C. Block (*pro hac vice* forthcoming)
Mark Byrne (*pro hac vice* forthcoming*)*
Brendan Jarboe (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
mark@blockleviton.com
brendan@blockleviton.com

*Counsel for Lead Plaintiff Erwin Ortiz and Lead
Counsel for the Putative Class*

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS